29 So.2d 590

WELLS et al. v. DEAN et al.

No. 37937.

Feb. 10, 1947.

A. V. Hundley, of Alexandria, and Ellis, Barranger & Suthon and Frank B. Ellis, all of Covington, for plaintiffs–appellants.

J. B. Nachman, of Alexandria, for defendant–appellee.

PONDER, Justice.

Plaintiffs are appealing from a judgment of the lower court rejecting their demands.

The plaintiffs, alleging themselves to be pledgees of a certain note calling for $22,-500, pledged to them in due course of business to secure the payment of certain indebtedness due them by the maker of the note, Mrs. Helen J. Bordelon Dean, brought this suit against the defendants, Mrs. Dean, and Mrs. Mamie H. Sterkx, the endorser, seeking to recover the amount of indebtedness due them by the maker of the note. Mrs. Dean filed no answer to the suit and no judgment is sought against her; but the endorser is vigorously opposing the demands of the plaintiffs.

Hanson D. Bordelon and his wife, Jennie S. Bordelon, the daughter of Mrs. Mamie H. Sterkx, became interested in the purchase and development of a summer resort near Alexandria known as Castor Plunge, then owned by Mrs. Mattie O. Ball, the

wife of J. Nelson Ball. The Bordelons were so financially involved that they could not acquire the property in their names; in fact, the record shows that there are numerous judgments of record outstanding against Hanson D. Bordelon and his wife. The property was acquired as a matter of convenience in the name of their daughter, Helen Bordelon, a minor eighteen years old who had been recently emancipated. In reality it was the Bordelons who were the interested parties. The record shows that Hanson Bordelon transacted the purchase and made subsequent improvement of the resort as agent for his minor daughter, and after the marriage of his daughter in the late summer of 1942, handled all matters under a power of attorney. The property was acquired for part cash, and the remainder of the purchase price was secured by vendor's lien and mortgage. Being unable to make the cash payment, the Bordelons turned to Mrs. Mamie H. Sterkx, an elderly woman of Alexandria, Louisiana, and the mother of Mrs. Bordelon, for assistance. It appears that Mrs. Sterkx, now deceased, was comparatively wealthy and had assisted her children from time to time by endorsing notes for them over a period of years. She had previously endorsed notes calling for small amounts for Hanson and Jennie Bordelon, and had endorsed renewal notes which she finally had to pay. The Bordelons secured her endorsement for a note covering the down payment for the resort, which note was finally paid by Mrs. Sterkx.

The Bordelons desired to improve the resort by making necessary repairs, constructing cabins, a dance hall, etc., at an estimated cost of $20,000 to $25,000. On January 2, 1942, Helen Bordelon, now Mrs. Dean, executed a note for $22,500 and obtained the signature of Mrs. Sterkx thereon as endorser. The note was valuable only because of the endorsement. At the time the endorsement was secured Mrs. Sterkx was eighty-one years old, with impaired eyesight due to cataracts. Her sight began to fail in 1936, and this condition became progressively worse, to such an extent that at the time she signed the note she was unable to read. In fact, the condition became so aggravated that she was unable to recognize anyone by sight at the trial of this case. Mrs. Sterkx claims that her endorsement to this note was secured through fraud.

Hanson D. Bordelon obtained a loan from Mrs. D. R. Carpenter, the great-grandmother of Helen Bordelon, of $7,500, in February, 1942. $1,500 of this loan was used in the purchase of a trousseau for Helen at the time of her marriage. The loan was obtained on the strength of the Sterkx note, as Helen wrote Mrs. Carpenter a letter pledging an allocation of $7,500 from the proceeds of the Sterkx note, stating that she was handing the note to her as collateral security for her personal note of $7,500. It is stated in the letter that it is understood that J. Nelson Ball will hold the Sterkx note for each person interested.

The Sterkx note was never delivered to Mrs. Carpenter, and was not in the possession of Ball at any time in February.

The Bordelons exhibited the Sterkx note to Ball some time in March, when the Bordelons and Ball were living at Castor Plunge. They endeavored to get Ball to discount the note, but he was unable at that time to advance any cash. They requested his assistance in negotiating the note to some third party out of the city of Alexandria, representing that it was Mrs. Sterkx' wish that the note not be handled in Alexandria for the reason that other members of the family would learn of it and complain. The Bordelons and Ball took the Sterkx note and the notes representing the balance of the purchase price of Castor Plunge to the bank in Cottonport with the view of negotiating a loan. The bank gave them a receipt for the notes and took the matter of the loan under advisement. The bank refused the loan and returned the notes to Ball on March 20, which was the first time the physical possession of the Sterkx note came into the hands of Ball, although he knew of the note before that time and knew that it was the purpose of the Bordelons to develop the resort with the proceeds of the note or the credit which it afforded. It was understood that if the note was negotiated, Ball was to take from the proceeds the amount of the indebtedness due Mrs. Ball for the balance of the purchase price of the resort, and pay whatever indebtedness might have been incurred

by the Bordelons in developing Castor Plunge. Ball placed the note in the safe of Mr. Bolden, his brother-in-law, for safekeeping.

John Skodack, one of the plaintiffs, then doing business in the name of John Skodack & Sons, entered into a written contract with the Bordelons to build eight cabins and improve a swimming pool. He was to furnish all labor and materials and do the work for the price of $7,595.96. The contract provided that the owner was to pay the contractor one-half of the contract price in cash upon completion of four units. The contract is undated. Skodack began work under the contract on March 28. At that time or shortly thereafter Hanson Bordelon brought Skodack to Ball, who exhibited to him the Sterkx note and signed the following statement on the bottom of the contract, viz.: "J. Nelson Ball hereby agrees to allocate to us as payment of the above $7,595.96 from the $22,500 note which he now holds." This statement is not dated.

On April 4, Ball turned the note over to Helen, accompanied by a letter wherein it was stated that in accordance with her instructions he was returning the note, handed him for discount (meaning the Sterkx note) to her father as he was unable to pay the difference.

On the 9th or 10th day of April, Skodack, Ball and a third person went to the Guaranty Bank and the Rapides Bank and attempted to negotiate the note. Neither of the banks would handle the note and in-

formed the parties they would not buy a lawsuit. The president of the Guaranty Bank telephoned Mrs. Sterkx, and she denied that she had endorsed a note for that amount for Helen.

On April 11, Helen executed a note to Skodack in the amount called for by the contract. This note was executed immediately after the parties had been informed by the banks that they did not want to buy a lawsuit. In our opinion it is significant that this note was executed for the full contract price covering the erection of eight cabins and other improvements, when in fact not even the first four cabins had been completed. Under the terms of the contract, referred to above, the owner was to pay one-half of the contract price on the completion of the first four cabins. On the same date Helen also executed a note to William S. O'Shee; and on April 13 she executed a note to Cecil Berlin, for amounts alleged to be due them. On the back of the notes given by her to Skodack and O'Shee we find an undated notation that they are secured by the Sterkx note. This notation is in the handwriting of Hanson Bordelon.

After Mrs. Sterkx received information that such a note was in existence, she contacted Mr. Ball with the view of having the note examined, and was informed by him that the note was in New Orleans. After unsuccessful attempts to have the note examined she had a notice published in big block type in the Alexandria Daily Town Talk and a Shreveport paper for a week, warning the public not to purchase or negotiate notes bearing her signature or endorsement as they were procured through fraud and she would not be liable for any amounts they called for. On April 24 she notified Ball by registered letter, written by her attorney, that she did not sign the note in any capacity, and if her signature appeared on it that it was procured through fraud.

It appears that after April 4 this note at various times was in the hands of Ball, Skodack, or Bordelon. In fact, Skodack testified in another case that a football was made of the note. It remained in Bolden's safe for short intervals, and as the trial court stated in its opinion, it had a restless existence from the date it was received by Ball from the Cottonport Bank until November 26, 1942, when it was finally turned over by Bolden to Bordelon on instructions from Ball. This is the last connection that Ball had with the note.

We do not believe that Ball's testimony is such to indicate that he accepted the note as the holder of a pledge. In fact, the purport of his testimony is that if the note was negotiated he would allocate the funds to certain parties. He stated that he regarded the note as being the property of the Bordelons and would give it to them at any time they requested it. He was asked the question: "* * * if Mr. Bordelon had wanted to take the note, or Miss Helen had wanted to take the note any time

after April 4th and throw it in the Red River, we will say, you would have given it to them, wouldn't you?" His answer to this question was in the affirmative. He further stated that it was their note and they could do what they wished with it.

The plaintiff, Cecil Berlin, the holder of the promissory note in his favor for $1,805, executed by Helen to cover an indebtedness due him for doing the plumbing work at Castor Plunge, contends that the Sterkx note was pledged to secure the debt due him. There is no notation on the back of his note indicating that it was secured by the Sterkx note. He first saw the Sterkx note in the possession of Hanson Bordelon. He began work under his plumbing contract about April 1, and continued until May 15. Although he saw the note in the possession of Bordelon, it was not pledged to him, as Bordelon merely informed him that the note would be given to Ball who would hold it for his protection. There was never any understanding between Berlin and Ball, although Ball knew that if the note was negotiated Berlin was to be paid. From Ball's testimony it appears that it was his understanding that if the cash could be realized from the note, Berlin's claim as well as others would be paid. This is confirmed by a letter written by Ball to Berlin on April 14, advising him that when he collected the Sterkx note that he would pay over to him the amount due, but would not be liable in event he failed to negotiate the note. This letter, however, was not mailed to Berlin on Hanson Bordelon's instruction.

The plaintiff O'Shee, a creditor of the Bordelons in amount of $2,700 for beer, etc., represented by a note executed by Helen, never had any understanding with Ball to the effect that the Sterkx note was pledged to secure this indebtedness.

The Bordelons were indebted personally to the plaintiff John P. Rush in the amount of $800. Rush was unable to collect this amount, and secured a note from Helen on February 19, 1942, executed in his favor for $800. There is an undated notation on the back of this note to the effect that it is secured by the Sterkx note. At the time the note was given to him, the Bordelons informed Rush that the Sterkx note was in the possession of Ball. There was never any communication or understanding between Ball and Rush. It appears that Ball actually did not have possession of the note in February. Sometime in the month of April, Rush and Skodack had a conversation, at which time Skodack informed Rush that he had the note and would see that Rush was protected. The note was never in the possession of Rush and in fact he never saw it.

These are the salient facts touching the question of whether or not Ball was holding the Sterkx note in pledge to secure the indebtedness due the plaintiffs. It is very significant, in our opinion, that on April 11 Skodack wrote a letter to Helen acknowledging receipt of the Sterkx note and stat-

ing therein that he agreed to act as trustee and custodian of the note for his benefit and that of the other pledgees. No copies of this letter were ever sent to the persons named as the other pledgees therein. This letter was prepared after the banks had informed Skodack and others that they would not accept the note because they did not want to buy a lawsuit. Moreover, this is inconsistent with the plaintiffs' contention that Ball held the note in pledge, and it would appear that by this act plaintiffs demonstrated that they themselves did not consider that Ball held the note in pledge for them.

■ When the property of a debtor is pledged in favor of his creditors, the act of pledge by which a privilege over the property is granted to a creditor or creditors must be evidenced by a specific and definite contract. The delivery of possession of the pledge is the essence of the contract. The pledgor must be dispossessed to the extent of fully securing the pledge. Where the possession is held by a third person, it must be definitely agreed by the parties that the possession is for the account of the pledgee, and the third person must have full knowledge of the trust and accept delivery and possession with the obligation imposed by the trust. As stated in Denis, Contract of Pledge, Sec. 127, page 114, "There must be between him and the parties to the pledge a juridical obligation, without which there would be no proper delivery to the pledgee, no proper possession by him and, therefore, no legal pledge." In the case of Commercial Nat. Bank in Shreveport v. Parsons, 5 Cir., 144 F.2d 231, 236 (rehearing denied, 5 Cir., 145 F.2d 191, certiorari denied, 323 U.S. 796, 65 S.Ct. 440, 89 L.Ed. 635), this same doctrine is approved in the following language: "The relation between debtor and creditor or principal and guarantor is not necessarily one of trust and confidence, but that between pledgor and pledgee or liquidator and cestui que trust is inherently one of a fiduciary character."

Our holding in this case is supported by Articles 3152, 3157, 3162, 3164, 3165 and 3166 of the Revised Civil Code and the following cases: Casey v. Cavaroc, 96 U.S. 467, 484, 24 L.Ed. 799; Martin v. His Creditors, 15 La.Ann. 165; Succession of Lanaux, 46 La.Ann. 1036, 15 So. 708, 25 L.R.A. 577 and Britton & Koontz v. Harvey, 47 La. Ann. 259, 260, 16 So. 747.

■ The continued possession of the thing pledged by the pledgee is essential, and delivery of the possession to the pledgor terminates the title except where the delivery is for a temporary purpose only and for the benefit of the pledgee. The evidence in this case shows that Ball at no time considered himself as being under any obligation to the purported pledgees except in the event the note was negotiated while it was in his possession; and then, to distribute the proceeds only to those whom Bordelon would indicate. He did not consider that Bordelon had divested himself of the possession of the property because it is apparent all through his testimony that he would

have delivered the Sterkx note to either of the Bordelons at any time, for them to do what they pleased with it. Ball did deliver it to Bordelon on many occasions, sometimes accepting a receipt for the note and at other times without any receipt. Evidently the parties did not think that Ball held the note in pledge because immediately after the banks of Alexandria indicated that there was something wrong with the note they attempted to perfect a pledge in the name of Skodack.

Vaughn, a sub-contractor, filed a labor lien against the property in the amount of $1,638.53, on June 12, 1942, which was duly recorded. On June 15, Skodack filed his lien for material, in the amount of $3,716.-46, and it also was recorded. On June 29 Skodack had a writ of sequestration issue, and the property was seized on June 30, 1942. On November 12, Vaughn filed suit on his lien, to collect the sum due him for labor.

It is impossible to tell from the record where the Sterkx note reposed from the date that Skodack received it until it was delivered to Bordelon by Bolden, on Ball's instruction, on November 26. The testimony would indicate that it was in the hands of various persons on the same date during that period of time, and not in the possession of a particular one for any length of time. The note was probably in the possession of Hanson Bordelon from November 26 until December 22, when it was turned over to the plaintiff Thomas O.

Wells, and a formal act of pledge was executed. This happened long after all the parties knew that Mrs. Sterkx claimed the note was procured through fraud, and long after notice had been given in the papers during the previous April. The lower court states in its opinion that Mrs. Sterkx' position with regard to the note was generally discussed in the community during that period.

At the time the formal pledge was executed to Wells as pledgee, a note was executed in his favor by Helen for $10,000. There was no consideration given for the note at that time, but on December 30 Wells purchased Mrs. Carpenter's claim for $7,500. Wells has entered a remittitur, and is only claiming that he is due $7,500.

On January 2, 1943, demand was made on the maker and endorser of the Sterkx note, and payment was refused.

A week later Skodack wrote the Clerk of Court authorizing him to cancel his lien, as well as the notice of seizure; he also authorized the Clerk to cancel Vaughn's lien, which Skodack had been assigned by Vaughn for a valuable consideration. Vaughn's suit filed the previous November, was also dismissed at plaintiff's request. Skodack's explanation of why he released these liens is very unsatisfactory and would indicate that an attempt was to be made to force payment of his claim out of the Sterkx note without protecting Mrs. Sterkx' rights that necessarily would flow from the liens. Article 3061, R.C.C. It

would appear from the codal articles dealing with suretyship that Skodack was obligated to Mrs. Sterkx not to release any security that he held. However, it is not necessary for us to go into that question for the reason that the evidence in this case does not support the plaintiff's contention that the note was held in either Ball's or Skodack's possession in pledge.

The formal pledge executed to Wells was perfected long after knowledge of the note's defect, and in our opinion if the endorsement was secured through fraud the parties are without recourse. Act No. 64 of 1904, §§ 52, 54, 55, 56, 58 and 59.

The question of whether or not the endorsement was secured through fraud resolves itself to the credibility of the witnesses. It is significant that Hanson Bordelon, who handled all these transactions for Helen, although present in court and available throughout the trial, did not take the stand to testify. The lower court was not impressed with the evidence of the plaintiffs in respect to this issue, but accepted the version tendered on behalf of Mrs. Sterkx. After considering the evidence in respect thereto, we are compelled to reach the same conclusion. This conclusion is not only supported by that testimony but by all the other circumstances shown in this case.

It has been argued that the defendants did not prove beyond a reasonable doubt that Mrs. Sterkx' endorsement was procured through fraud. If we accept plain-

tiffs' contention that fraud must be proved beyond a reasonable doubt, it is sufficient to say that the evidence shows beyond a reasonable doubt that the endorsement was secured through fraud. As we take it, Mrs. Sterkx was led to believe that she was signing a renewal note for a small amount.

For the reasons assigned, the judgment is affirmed at appellants' cost.