88 So.2d 410 (1956)
In re PAN AMERICAN LIFE INSURANCE COMPANY, Praying for Concursus.
No. 8535.
Court of Appeal of Louisiana, Second Circuit.
June 14, 1956.
Rehearing Denied July 11, 1956.
Writ of Certiorari Granted December 10, 1956.
*411 H. Alva Brumfield, Baton Rouge, for Scotts et al.
Julian E. Bailes, Natchitoches, for Corkern et al.
Solomon S. Goldman, New Orleans, for Pan American Life Ins. Co.
GLADNEY, Judge.
The Pan American Life Insurance Company as a stake holder of proceeds of one of its policies issued July 27, 1926, upon the life of Ronald Eston Corkern for $2,000, designating Mrs. Viola M. Scott as beneficiary thereof, provoked this suit, a concursus under the provisions of LSA-R.S. 13:4816, to have legally settled the rights of opposing claimants. On a prior occasion we considered an appeal in this case involving a plea of prescription which this court determined favorably to the heirs of Mrs. Viola M. Scott, and the cause was remanded for further proceedings. See La.App., 75 So.2d 524. Following trial in the lower court on its merits, judgment was rendered awarding the proceeds of the policy to Mrs. *412 Ruby Jones Corkern, widow of Ronald Eston Corkern, and her minor children. Wherefore this appeal.
The facts are not disputed and the issues presented concern legal entitlement to the amount on deposit. On August 27, 1929, Mrs. Viola M. Scott entered into a written contract with R. S. Corkern and his son, Ronald Eston Corkern, wherein Mrs. Scott agreed to loan money for the medical education of Ronald Eston Corkern up to the amount of $2,500, to be advanced over the four succeeding years. It was provided in the agreement, Ronald Eston Corkern:
"In order to secure a payment of the sums advanced to him, in the event of his death he will make the said Mrs. Viola M. Scott beneficiary in a policy of life insurance now carried by him in the sum of Two Thousand ($2,000.00) Dollars, in the Pan American Life Insurance Company, and he agrees that should it be necessary the said Mrs. Viola M. Scott shall have the right to advance any additional sum necessary to pay the premiums due on said policy of life insurance, and for such amounts expended by her he shall furnish his promissory note stipulating the same rate of interest and maturing at the same time as the notes above mentioned. Appearer Ronald Eston Corkern agrees, however, to keep the said insurance in force, to let the dividends accrue thereon and not accept anything from said insurance company that would decrease the cash or loan value of said insurance or otherwise reduce the same without the consent of the said Mrs. Viola M. Scott. Mrs. Scott agrees to reimburse his parents or closest heirs any amount she would receive in event of his death, in excess of amount loaned him."
In conformity with the agreement Corkern wrote the Pan American Life Insurance Company enclosing the policy referred to requesting the beneficiary be changed to Mrs. Viola M. Scott, and directed that the policy be returned to the First National Bank of Oberlin, Louisiana, "with instructions to just hold in escrow as they have already been advised concerning this transaction." Accompanying the letter properly executed was the regular form used by the insurer to designate a change of beneficiary. The form designating the new beneficiary reserved to the insured the right of revocation.
In the years which followed, Mrs. Scott advanced the sum of $2,300 and Corkern executed his five promissory notes totaling $2,300 dated August 26, 1929, September 8, 1930, September 1, 1932, May 1, 1933, and February 7, 1934, respectively, each bearing interest at the rate of 4%. Pursuant to the instruction the assurer forwarded the policy to the bank "to be held in escrow." The First National Bank of Oberlin, perhaps some time during the years of the depression, became insolvent and was closed and placed in receivership. In response to an inquiry, the office of the comptroller of the currency which had supervised the affairs of the bank during its receivership reported that upon liquidation of the bank and under proper authority on January 30, 1940, all of the books, records and papers of the bank had been destroyed. It reported further that that office had been unable to find any reference to the policy in question.
Mrs. Viola M. Scott died on March 1, 1948, and Dr. Ronald Eston Corkern died February 20, 1953, without having designated another beneficiary. In probate proceedings which followed the deaths of said parties, the heirs of Mrs. Scott and the widow and heirs of Dr. Corkern were judicially recognized as such. Upon opening the bank box of Dr. Corkern after his death the policy was found. Mrs. Letitia Kent Bingham, who had acted as the doctor's secretary since about 1940, testified that she knew nothing of the circumstances surrounding the policy, other than she had in the course of her duties paid the premium notices as they were received in her office. No other evidence was adduced to show how possession of the policy was obtained by Dr. Corkern.
*413 The heirs of Mrs. Scott assert the policy was delivered to the First National Bank of Oberlin in fulfillment of Dr. Corkern's obligation to secure payment of the loan and that upon its delivery to the bank with Mrs. Scott designated as beneficiary therein, the transaction either constituted a pledge or an assignment of the policy. They declare no payments were ever made upon the loan and, therefore, they are entitled to the proceeds due under the policy.
The claim of the surviving widow and minor children is based upon a provision of the policy providing that in the event the beneficiary should pre-decease the insured, in the absence of the designation of another beneficiary the policy would be payable to claimants as the widow and the sole and only heirs of the deceased. They deny the policy was pledged or assigned, it being argued that the policy was never actually delivered to nor did it remain in the possession of the pledgee.
None of the witnesses professed to firsthand knowledge that the obligation of Dr. Corkern was satisfied, nor, in truth, was anyone in a position to say how Dr. Corkern came into possession of the policy. The presumption is strong that his possession resulted from the liquidation of the affairs of the escrow agent, the First National Bank of Oberlin. Had Dr. Corkern, in fact, made any payments upon the obligation represented by the notes, it is reasonable to assume there would be residual evidence of such payments such as a written notation of the amount and date of remittance. Further, if he had fulfilled his obligation to Mrs. Scott it is logical to believe that he would have caused the beneficiary to be changed for the interest of his wife and family. Since none of these things was done, it is proper to deduce that someone employed in winding up the affairs of the bank simply handed to or otherwise delivered the policy to the insured.
Appellee also contends the long and continued possession of the insurance policy by Dr. Corkern suggests remission or payment of the debt. The burden of establishing this defense rests upon the party relying thereon. Code of Practice art. 329; LSA-Civil Code art. 2232; J. R. Watkins Company v. Calhoun, 1951, 219 La. 151, 52 So.2d 528; Pitre v. Bourg, La. App.1954, 77 So.2d 113. The amount loaned by Mrs. Scott was represented by five promissory notes which evince no inscriptions to indicate payments were made and these notes remained constantly among the effects of the creditor or her heirs. We have no difficulty in holding the obligation created by Ronald Eston Corkern has not been discharged by remission or payment.
Counsel for appellees, arguendo, concede that transaction by the assured may have constituted a pledge of the proceeds of the policy for the debt but deny that it constituted an assignment of the proceeds of the policy. It is urged there was no initial delivery of the thing sought to be pledged or if this did occur from delivery to and continued possession by the First National Bank of Oberlin, the pledge terminated when possession of the policy was restored to the pledgor. Our resolution of the facts and applicable legal principles would seem to destroy the effect of the distinction sought to be established between assignment and pledge. For, if we find there was an assignment of the policy title to its proceeds passed to Mrs. Scott and the subsequent possession of the policy by the assured was immaterial. Should we, on the other hand while assuming the existence of a pledge, conclude the possession of Dr. Corkern was precarious, we would be forced to hold the pledge was not invalidated merely by such precarious possession. Our impression is, and we so hold, that the several steps taken by Dr. Corkern in order to fully comply with the terms of his solemn agreement in legal contemplation constituted an assignment of the policy. Counsel cannot be permitted to argue the possession of the bank as escrow agent was not also the possession of Mrs. Scott, irrespective of her capacity of assignee or pledgee. Delivery of the policy to the bank had the same legal *414 effect as if it had been placed in the hands of Mrs. Scott.
The insurance policy expressly authorizes an assignment of the policy subject to a prescribed notice, concerning which notice no question is raised in the instant case. According to Corpus Juris Secundum, the word "assignment" has a comprehensive meaning and in its most general sense is a transfer or making over to another of the whole of any property, real or personal, in possession or in action, or of any estate or right therein, and is distinguished from a pledge in that an essential feature of an assignment is a transfer of the entire title, whereas an essential feature of the pledge is a transfer of possession. The same authority declares:
"Any language, however informal, if it shows the intention of the owner of the property or chose in action to transfer it, and sufficiently identifies the subject matter, will be sufficient to vest the property therein in the assignee. Accordingly a valid assignment of a chose in action evidenced by a written instrument may be made by a separate writing, or the assignment of a fund may be in the form of an order on the debtor or holder thereof to pay the debt or fund to another person."
See 6 C.J.S., Assignments, §§ 1 a, 2 b (8), 52. The foregoing legal principles are applicable in this state. See Strudwick Funeral Home, Inc., v. Liberty Industrial Life Insurance Company, Inc., La.App.1937, 176 So. 679, 681. The following articles of our LSA-Civil Code have particular significance:
No. 2642: "In the transfer of credits, rights or claims to a third person, the delivery takes place between the transferrer and the transferree by the giving of the title."
No. 2643: "The transferree is only possessed, as it regards third persons, after notice has been given to the debtor of the transfer having taken place.
"The transferee may nevertheless become possessed by the acceptance of the transfer by the debtor in an authentic act."
No. 1909: "If the obligation be to deliver an object which is particularly specified, it is perfect by the mere consent of the parties. It renders the creditor the owner, and although it be not delivered to him, puts the thing at his risk from the date of the obligation, if the contract is one of those that purport a transfer."
It was stressed in Strudwick Funeral Home, Inc., v. Liberty Industrial Life Insurance Company that while it is not necessary for an assignment to be expressed in any particular form it is vital that it reveal a positive intention on the part of the assignor to transfer title to the assignee. The instrument there under consideration was held not to constitute an assignment as it did not show the beneficiary intended to transfer title to the proceeds of an insurance policy to an undertaker. A similar conclusion was reached in Spremich v. Somerfield, La.App.1936, 166 So. 630. However, in Rosenblath v. Rice, La.App. 1954, 73 So.2d 812, this court held that a letter by the beneficiary of a union death benefit fund delivered to a union official indicated an intention to assign an interest in the fund and, therefore, constituted an assignment in the amount stated.
The compliance of Corkern with the expressed terms of the agreement in requesting a change of beneficiary and directing that the policy be forwarded to the bank as escrow agent, in our opinion, manifested an intent and design to have the proceeds of the policy pay his undischarged obligation.
Notwithstanding the strong presumptions which arise from the undisputed facts, learned counsel for appellees argues the negation of the assignment. He says there is no language indicating a transfer of title to the policy. As above pointed out, intent is of the essence of an assignment.
*415 We think there can be little doubt Corkern intended the proceeds of the policy should be handed over in satisfaction of the obligation. Secondly, it is contended any intent to transfer title is inconsistent with the right to change the beneficiary (Mrs. Scott), which right was reserved to the assured. We do not agree this is so. The assured had the right to pay his debt at any time and then surely he was entitled to have the beneficiary changed and exercise all other rights of full ownership. On the other hand had he changed the beneficiary from Mrs. Scott to another prior to satisfying his obligation which stipulated the policy was to be security therefor, he would have been in bad faith and breached his contract. Furthermore, in such event no doubt the assurer would have required the consent of the named beneficiary who had a vested interest in the policy until the debt was paid. Finally, counsel declares that since the policy provides that should the named beneficiary die prior to the insured, the proceeds should be paid to the estate of the assured. Payment of the policy under this provision can be realized only if the assured or his heirs have a proprietary interest in the policy upon the death of the insured and would be applicable in the instant case only if the amount payable under the policy exceeded the amount of the assured's obligation. It does not appear the assured or his heirs have any present interest as there is no excess over the debt.
With further consideration of the issue raised by counsel for appellees that the transaction reflects the confection of a pledge and not an assignment, the following articles of the LSA-Civil Code are relevant:
No. 3133: "The pledge is a contract by which one debtor gives something to his creditor as a security for his debt."
No. 3152: "It is essential to the contract of pledge that the creditor be put in possession of the thing given to him in pledge, and consequently that actual delivery of it be made to him, unless he has possession of it already by some other right."
No. 3153: "But this delivery is only necessary with respect to corporeal things; as to incorporeal rights, such as credits, which are given in pledge, the delivery is merely fictitious and symbolical."
No. 3160: "When the thing given in pledge consists of a credit or instrument not negotiable, the pledge shall be complete as to all the world, as soon as the debtor of such pledged credit or instrument shall have been notified in writing of the giving of such pledge."
No. 3441: "Those who possess, not for themselves, but in the name of another, as farmers, depositaries and others who acknowledge an owner, can not acquire the legal possession, because, at the commencement of their possession, they had not the intention of possession for themselves but for another."
No. 3556, par. 25: "Precarious.  That possession is called precarious, which one enjoys by the leave of another, and during his pleasure.
"The title which excludes the ownership, such as a lease, is also called precarious."
It is well recognized that from the very nature of the transaction there arises a trust relationship between the pledgor and pledgee with attendant duties to protect the debt or the obligation and the collateral. The pledgee is presumed to act for the pledgor's interest as well as his own, although their interests are not identical. The pledgor by his act of pledging, impliedly engages that he is the general owner of the property pledged, and cannot be heard to deny the equitable rights of the pledgee therein. 72 C.J.S., Pledges, §§ 21 b, 21 c. pp. 28, 29. The same authority further declares that the privilege of a pledgee may not be extinguished by an involuntary surrender of the pledged property by him. Id., § 27, p. 40.
*416 In Conger v. City of New Orleans, 1880, 32 La.Ann. 1250, 1253, the Supreme Court said:
"Possession, though essential to the validity of the pledge, need not be always in the creditor. It is sufficient that the thing pledged be in the possession of one occupying ad hoc, the position of a trustee. The debtor himself may, in some cases, be considered as such trustee and be given possession of the thing by him pledged, provided his tenure be precarious and clearly for account of the creditor. The Louisiana doctrine is in perfect accord with both the common, the Roman and French laws." (Citation of authorities omitted.)
It is clear that possession for the pledgee by a third party is equivalent to the possession of the thing by the pledgee. See Wells v. Dean, 1947, 211 La. 132, 29 So.2d 590; Davis v. Davis, La.App.1951, 50 So.2d 647. In Foote v. Sun Life Assurance Company of Canada, La.App.1937, 173 So. 477, the court expressly recognized that the property pledged may be placed in the hands even of the pledgor himself under certain conditions and the validity of the pledge may not be affected thereby.
We are of the firm opinion the facts herein presented disclose that the possession of the policy by Dr. Corkern was ad hoc, or in the nature of that of a trustee. Undoubtedly, he received possession of the policy without the knowledge or consent of the pledgee and his retention of the policy was for the account of the pledgee. In a recent case, Ducros v. Williams, 1950, 217 La. 418, 46 So.2d 612, the Supreme Court recognized and enforced a pledge of a policy of insurance. The evidence sustained a finding contrary to the contention of the widow that the life policy taken out by the son naming the mother as beneficiary was pledged to the mother as security for the son's note. The court determined payment of the amount of the policy to the mother had the effect of discharging the indebtedness on the note. There was no question as to actual possession of the policy by the pledgee. The facts were insufficient to indicate a clear intention by the insured to create an assignment.
The foregoing reasons impel us to hold that the policy and its proceeds were assigned to Mrs. Scott, and consequently belong to her heirs, the present claimants in this case.
The judgment from which appealed should be reversed and judgment rendered in favor of the heirs of Mrs. Viola M. Scott, recognizing their right to be paid the amount deposited by the assurer.
It is therefore ordered that the judgment from which appealed be and the same is hereby annulled, reversed and set aside.
It is further ordered, adjudged and decreed that there be judgment in favor of Mildred Scott, Mrs. Margaret Kitsch, Mrs. Sylvia Brumfield and Samuel M. Scott, and against Mrs. Ruby Jones Corkern, individually and as tutrix of her two minor children, Connie Sue Corkern and Ronald Eston Corkern, Jr., in the sum of $2,000, deposited by the Pan American Life Insurance Company, in the registry of the court.
It is further ordered that W. G. Stroud, clerk of court of Natchitoches Parish, Louisiana, pay over to Mildred Scott, Mrs. Margaret Kitsch, Mrs. Sylvia Brumfield and Samuel M. Scott, $2,000 deposited in the registry of the court by Pan American Life Insurance Company.
It is further ordered, adjudged and decreed that all costs of these proceedings be paid out of the funds deposited, with preference and priority over any and all persons, reserving, however, to Mildred Scott, Mrs. Margaret Kitsch, Mrs. Sylvia Brumfield and Samuel M. Scott their right to recover costs which have been paid out of the funds deposited, subject to and as provided for by LSA-R.S. 13:4816. All other costs are to be paid by appellees. Reversed and rendered.