No. 40,202

THE BOMUD COMPANY, a Corporation, *Appellant*, v. YOCKEY OIL COMPANY, INC., a Corporation, and R. B. OSBORN, *Appellees*.

(299 P. 2d 72)

Opinion filed June 30, 1956.

*T. Hillas Eskridge*, of Tulsa, Oklahoma, argued the cause, and *Marvin E.*

*Thompson, George W. Holland* and *Clifford R. Holland, Jr.,* of Russell, and *Bradford J. Williams, Fenelon Boesche, Richard B. McDermott* and *Franklin D. Hettinger,* of Tulsa, Oklahoma, were with him on the briefs for the appellant.

D. A. *Hindman,* of Stockton, argued the cause, and *Stanley Krysl,* of Stockton, was with him on the briefs for the appellees.

The opinion of the court was delivered by

FATZER, J.: This was an action to recover money from Yockey Oil Company, Inc., upon its open account, and from R. B. Osborn upon a written contract entered into with plaintiff March 30, 1951. Yockey Oil Company, Inc., contended that the statute of limitations barred recovery against it; Osborn contended that pursuant to his contract he was a guarantor for the principal debtor, Yockey Oil Company, Inc., and that since the action was barred as to the principal, it was therefore barred as to himself, as guarantor. The trial court sustained Osborn's motion for judgment on the pleadings, and plaintiff has appealed.

Yockey Oil Company, Inc., hereafter referred to as Yockey, owned interests in certain oil and gas leases and managed the leases for the other interest holders. In connection with such management it purchased drilling mud and supplies from plaintiff, hereafter referred to as Bomud, between March 10, 1951, and August 1, 1951, on open account totaling in the sum of $4,926.18.

On March 30, 1951, Osborn, the president and a stockholder of Yockey, entered into a written contract with Bomud to secure credit for Yockey, or the extension or the renewal of such indebtedness, and agreed to pay such indebtedness if Yockey defaulted as hereinafter more fully set forth. At that time Yockey was indebted to Bomud in the sum of $1,039.91, and Bomud had no security for the debt. Subsequent to the execution of the contract Bomud sold on open account and delivered to Yockey drilling mud and supplies totaling $3,886.27. No claim was made these products and supplies were not delivered to the various oil and gas leases managed by Yockey. As each delivery was made a representative of Yockey signed a delivery ticket receipting for the merchandise.

Omitting the signature and formal portions thereof, Osborn's contract with Bomud is summarized and quoted as follows: The first paragraph recites that Yockey (designated as party of the first part) was desirous of purchasing on credit from Bomud merchandise, tools, machinery and materials, and of opening an account with Bomud, which could be settled by notes and which could be

extended or renewed from time to time as might be agreed upon by Yockey and Bomud.

The second paragraph reads, in part, as follows:

"Now in consideration of One Dollar, and the giving of credit or the extension or renewal of said indebtedness, if such indebtedness is renewed or extended, to the said party of the first part by the said THE BOMUD COMPANY, we the undersigned, and each of us (Osborn), do hereby jointly and severally covenant and agree to and with the said THE BOMUD COMPANY that the said party of the first part shall promptly pay to the said THE BOMUD COMPANY any and all sums of money that shall become due it from the said party of the first part upon said account, and upon any and all notes given by the said party of the first part in settlement thereof, and of any and all renewals of the same, as the same shall become due. . . ."

and the guarantee also included all accounts then or thereafter owing by Yockey for merchandise, tools, machinery and materials theretofore sold and delivered or contracted to be sold and delivered, and all notes or renewals thereof in settlement of said account.

The third paragraph recites that Osborn waived the giving of all notice of acceptance of the guarantee by Bomud, or of the sale or delivery of any merchandise, tools, machinery and materials to Yockey, or of the giving of credit to Yockey, or of the giving of any notes by Yockey in settlement of such account, or of any extension or renewal of such notes. He also waived the giving of any notice of the non-payment of any accounts, notes or renewals thereof as they became due and any demands therefor, and all other notices or demands,

"the want of giving which to us (Osborn) by the said THE BOMUD COMPANY might in any way prejudice the right of THE BOMUD COMPANY to recover from us (Osborn) the amount of any claim or claims it may have against us (Osborn) by reason of this guarantee."

The fourth paragraph of the contract reads:

"And we (Osborn), the undersigned, do further agree that it shall not be necessary for THE BOMUD COMPANY in order to enforce the payment of such account or notes above referred to against us, or either of us (Osborn), to first institute suit or exhaust its remedies against the said first party or other parties liable on such account or notes or other evidence of debt arising out of the dealings between the said first party and THE BOMUD COMPANY, and we (Osborn) expressly agree that in case of default on the part of the said first party, that THE BOMUD COMPANY may bring its action immediately against either or all of the undersigned (Osborn) to recover the amount due and owing by the said first party."

The fifth paragraph recites that the provisions of the guarantee would extend to the successors and assigns of Bomud, and that

Osborn would pay the cost and expense including reasonable attorneys fees which might be incurred by Bomud in any suit to enforce payment of the indebtedness against either Yockey or Osborn.

The sixth paragraph of the agreement reads:

"It is understood that this guarantee is for an amount not exceeding $5,000.00 which may exist at any one time and that it shall be continuous so long as THE BOMUD COMPANY shall continue to sell merchandise, tools, machinery and materials to the said party of the first part."

By addenda Osborn stipulated that the contract was to terminate one year from date.

On September 21, 1954, Bomud filed this action, which was more than three years after the date of the last purchase by Yockey. When the suit was filed Yockey was insolvent. However, during the time materials and supplies were sold and delivered to Yockey, two oil and gas leases it owned interests in had producing wells on them but Bomud did not file a materialman's lien against Yockey's interest or take other steps to collect the debt except to make demands upon both Yockey and Osborn.

Bomud contends that the trial court erred in determining the indebtedness of Yockey was based upon an open account when it found the action against Yockey was barred by the statute of limitations. Bomud's contention was that each delivery ticket evidencing the delivery of mud products and supplies, when signed by a representative of Yockey, was a separate written contract rather than an open account, and that the five-year statute of limitations was applicable. When the appeal was argued, Bomud candidly conceded that its action against Yockey was based upon the open account and that it was barred by the statute of limitations. We shall consider this point as abandoned.

Bomud principally contends that Osborn's obligation to pay was based upon his written contract and its action thereon would not be barred for five years from the date his liability became absolute (G. S. 1949, 60-306, *First*), and that such period had not expired; that Osborn's contract was a separate, independent and direct agreement to pay the debt in case of Yockey's default, and his liability thereon was wholly unaffected by the fact that the statute of limitations had run in favor of Yockey on the open account; that Osborn expressly agreed it would not be necessary for Bomud to first bring suit or exhaust its remedies against Yockey to enforce payment; and further, that in case of Yockey's default, Bomud

might bring its action immediately against him to recover the amount due.

Osborn contends that when an action is barred against the principal, it is likewise barred as to the surety or guarantor and he is released. In support of his contention he cites and relies principally upon *Mulvane v. Sedgley*, 63 Kan. 105, 64 Pac. 1038, decided in 1901. He asserts that decision has stood as the law of this state for over fifty years and no reason exists why the trial court's decision, or the rule announced in that case should now be changed.

Both parties concede that the statute of limitations (G. S. 1949, 60-306, *Second*) pleaded by Yockey was a bar to the action on the open account. They also concede that a valid debt was incurred and in the event of Yockey's default, each was liable—Yockey on the open account and Osborn under his written contract. It was not contended that this debt had been paid or extinguished. It was merely contended that since the statute barred recovery from Yockey, Osborn, as guarantor, was relieved from his contract to pay.

A guarantor, to be relieved from his obligation to pay, must establish one of three facts: (1) the debt has been paid or extinguished; (2) a valid release or discharge; or (3) the bar of the statute of limitations as to himself. It is conceded that the debt has not been paid. The fact that the statute bars recovery against Yockey does not extinguish the debt. (*Holden v. Spier*, 65 Kan. 412, 417, 70 Pac. 438; *In re Estate of Reed*, 157 Kan. 602, 608, 142 P. 2d 824; 53 C. J. S. Limitations of Actions p. 922, § 6.) It is also conceded that the statute of limitations has not run as to Osborn's individual liability on his written contract if he has not been released or discharged. Did the failure to bring the action upon the open account, until the statute had run in favor of Yockey, release or discharge Osborn from his guarantee to pay under his written contract? We think it did not.

In *Mulvane v. Sedgley*, supra, the Mulvanes and the Munks executed and delivered to one Anna J. Hentig their two promissory notes secured by a mortgage on real estate in Topeka. The notes and mortgage were transferred to successive transferees and eventually to plaintiff Sedgley. The Mulvanes and Munks sold the mortgaged premises to Williams, who assumed and agreed to pay the notes and mortgage. Before the statute of limitations had expired, the Mulvanes and Munks moved from the State of Kansas.

Plaintiff Sedgley attempted to collect the notes and mortgage through an agent, John R. Mulvane, who recognized Williams as the party primarily liable for the debt. After the statute of limitations had expired as against Williams, Sedgley commenced the action against Williams, the Mulvanes and the Munks. We held that when the relation of principal and surety exists between mortgagors and a purchaser of mortgaged property, who assumes and agrees to pay the mortgage, and such relation is recognized and accepted by the mortgagee, and the cause of action against the purchaser or principal becomes barred by the statute of limitations, the action against the mortgagors or sureties on the notes and to foreclose the mortgage is also barred. While *Mulvane v. Sedgley,* supra, has been cited by this Court in a total of six cases, it has not been cited in support of the rule that the barring of an action against the principal by reason of the statute of limitations effects a discharge of the surety. (See *Fisher v. Spillman,* 85 Kan. 552, 118 Pac. 65; *Morlan v. Loch,* 95 Kan. 716, 149 Pac. 431; *Bank v. Bales,* 101 Kan. 100, 165 Pac. 843; *Nuzman v. Bennett,* 115 Kan. 766, 224 Pac. 900; *Tice v. Mahin,* 129 Kan. 447, 283 Pac. 491; *Federal Land Bank v. Butz,* 156 Kan. 662, 135 P. 2d 883.) While we do not believe the rule there established is controlling or applicable to the question here presented, we make note of it since we do not question its soundness as applied to the factual situation there existing.

We think *Mulvane v. Sedgley,* supra, is clearly distinguishable from the present appeal. There, the court found, as a matter of law, the relation of principal and surety was created by an application of equitable principles based upon the mutual dealings between the parties. Here, no equities are involved; the question is entirely legal in character.

Osborn's contract was one of guaranty. A guaranty is a contract between two or more persons, founded upon a consideration, by which one person promises to answer to another for the debt, default or miscarriage of a third person, and, in a legal sense, has relation to some other contract or obligation with reference to which it is a collateral undertaking. (*Sewing Machine Co. v. Gibbons,* 4 Kan. App. 237, 45 Pac. 946; 38 C. J. S., Guaranty, p. 1130, § 2; 24 Am. Jur., Guaranty, p. 873, § 2.) The contract of a guarantor is his own separate contract. It is in the nature of a warranty by him that the thing guaranteed to be done by the principal shall be

done, and is not an engagement jointly with the principal to do the thing. A guarantor, not being a joint contractor with the principal, is not bound like a surety to do what the principal has contracted to do, but answers only for the consequence of the default of the principal. The original contract of his principal is not his contract. (*Sewing Machine Co. v. Gibbons,* supra.) When default occurs on the part of the principal, the guarantor's liability becomes primary and is absolute. (*Railroad Company v. Howard,* 74 U. S. 392, 413; 19 L. Ed. 117; 24 Am. Jur., Guaranty, p. 921, § 71.)

Osborn's contract was a promise to pay the debt of another, and being in writing, the statute of frauds (G. S. 1949, 33-106) is not applicable. But, it was more than a promise to pay the debt of another. Osborn not only agreed to pay the $1,039.91 Yockey owed on March 30, 1951, but promised that if further credit be extended to Yockey and it defaulted, he would pay the amount then due plus all additional purchases not to exceed $5,000 at any one time.

The original contract of sales between Bomud and Yockey was not Osborn's contract. His guaranty was collateral to each sales transaction, and his liability only became primary and absolute when default occurred on the part of Yockey. The due date for payment on each sales transaction was 60 days after delivery. That Yockey did default is evident, and as early as 60 days after August 1, 1951, the last entry on the open account. Thereafter, Osborn was primarily liable for the debt on his separate guaranty. His liability was then absolute. Moreover, Osborn agreed that it was not necessary for Bomud to first sue or exhaust its remedies against Yockey to enforce payment against him, and that in case of default on the part of Yockey, Bomud might bring its action immediately against him to recover the amount due. It is clear that Bomud could not sue Osborn on Yockey's open account since his liability was not fixed by that transaction. When suit was filed Yockey pleaded the statute of limitations. That the statute was a good defense as to Yockey has been conceded. Does Yockey's defense constitute a valid release or discharge of Osborn to pay the debt he contracted to pay? We think not. Osborn's contract with Bomud was based upon a valid consideration. It was a separate undertaking to pay if Yockey defaulted. When Osborn's liability became primary and absolute, the open account was then enforceable against Yockey, and it is of no consequence to Osborn if since that time the statute has run in Yockey's favor. Osborn's

liability was fixed and determined by his written guaranty and that obligation has not been discharged. That the statute of limitations (G. S. 1949, 60-306, *First*) had not run in Osborn's favor when suit was filed, is conceded. The debt has not been paid. Bomud is entitled to recover from Osborn in accordance with the terms and conditions of his contract.

The judgment is reversed with directions to set aside the order entering judgment for Osborn on the pleadings, and to proceed in accordance with the views expressed in this opinion. It is so ordered.