No. 45,575

MARJORIE WALTON, *Appellant,* v. THE PIQUA STATE BANK, *Appellee.*

(466 P. 2d 316)

Opinion filed March 7, 1970.

*Elwaine F. Pomeroy*, of Topeka, argued the cause, and *Emerson M. Pomeroy* and *Allen A. Hazlett*, of Topeka, were with him on the brief for appellant.

*J. D. Conderman, of Iola*, argued the cause, and *Robert V. Talkington*, of Iola, was with him on the brief for appellee.

The opinion of the court was delivered by

FATZER, J.: The principal questions presented are whether the promise of Marjorie E. Walton comes within our statute of frauds (K. S. A. 33-106), as a "special promise to answer for the debt, default or miscarriage" of her brother, Robert E. Kendall, and

whether her deposit of $15,000 in a savings account in The Piqua State Bank constituted a valid pledge to secure an indebtedness to the bank.

The facts are not greatly in dispute. The plaintiff Marjorie E. Walton, is a young farm widow, and started helping her brother, Robert E. Kendall, financially, shortly after her husband's death in 1964. She had advanced him approximately $69,000 prior to the transaction in controversy. Some of the money was used to enable Kendall to move his family to Yates Center, but, by far, the majority of the money was used to enable him to set up his TV and Appliance business in Yates Center and to meet his business expenditures, such as obtaining inventory, meeting his payroll, making good insufficient checks written by him, and his business obligations in general. All of those transactions were entered into by Mrs. Walton to help her brother establish his business. She had no primary motivation to benefit herself.

About the time Kendall started his TV and Appliance business in Yates Center, Mrs. Walton signed a guaranty agreement with General Electric Credit Corporation (GECC) to enable him to finance his inventory. In September, 1965, Kendall was substantially in debt to GECC and it was pressing him for payment. It had a security agreement on his inventory and was going to pick it up. As he had done in the past, Kendall sought his sister's assistance. She loaned him $4,000 which he sent to GECC for the amount due. Between September, 1965, and October 14, 1966, Mrs. Walton advanced Kendall more than $22,000 on twelve different occasions to pay his creditors. Between the latter date and December 27, 1966, she advanced Kendall money for the same purpose on three other occasions, totaling at least $6,000. It was conceded her intention in making the loans was to enable Kendall to continue his financing arrangements, and to keep his inventory from being repossessed. The fact she guaranteed his indebtedness with GECC in no way influenced her decision.

The present controversy arises out of loans The Piqua State Bank made to Kendall on and subsequent to October 14, 1966.

Mrs. Walton's petition alleged she deposited $15,000 in a savings account in the bank; that she demanded a return of the deposit but the bank refused her demand; that it claimed she was guarantor of certain sums it advanced to Kendall, doing business as Kendall's TV and Appliance; that a copy of the purported guaranty agreement

the bank was relying on was attached to her petition as Exhibit A; that the same was null and void having no legal effect whatsoever, and was in violation of K. S. A. 33-106; that said purported guaranty agreement failed to comply with the statute of frauds in that it was not completely in writing; that the same failed to state with reasonable certainty each party to the contract, either by his own name or by such a description as would serve to identify him, or the name or description of his agent; that it failed to state with reasonable certainty the terms and conditions of all the promises constituting the contract, or to whom the promises were made; that neither the amount guaranteed, nor whose debt was guaranteed, was stated in said purported agreement; that no reference was made by said writing to the principal obligation, nor did the writing describe in any way the principal obligation, and that the purported guaranty was invalid since it was not supported by any valid consideration, and was not capable of being performed within one year. The petition further alleged misrepresentation and fraud on the part of the defendant, but no evidence was offered on this point. The prayer was that the purported guaranty agreement be declared null and void as being in violation of K. S. A. 33-106, and that plaintiff be permitted to withdraw the $15,000 deposited in the savings account.

The bank answered, and filed a cross petition. It admitted Mrs. Walton deposited $15,000 in a savings account in the bank, and, except as otherwise admitted or explained, it denied generally and specifically the petition.

The bank alleged Kendall sought a loan totaling $25,000, which it was unable to make since he did not have sufficient security; that Kendall was told by Dreiling, as president of the bank, the loan could be made if the plaintiff would guarantee it and deposit $15,000 in a savings account to be held as a guarantee. It further alleged a meeting on October 14, 1966, between Mrs. Walton, Kendall, and Dreiling, and that Mrs. Walton offered to guarantee the loan to Kendall and presented a true copy of a financial statement she had given to another bank; that Mrs. Walton offered to sign a written guarantee and to deposit $15,000 in a savings account to guarantee repayment of the loan, conditioned upon her being entitled to write checks upon the Kendall TV and Appliance account to which the proceeds of the loan were to be deposited; that it accepted plaintiff's offer, and made loans to Kendall on which

the present balance due was in excess of $25,000; that the proceeds of the loans were deposited to Kendall's TV and Appliance account and Mrs. Walton was authorized to write checks thereon; that Mrs. Walton deposited checks of the New England Life Insurance Company totaling $25,230.20, $20,000 of which was deposited in the savings account in the name of Marjorie E. Walton, and the bank remitted $5,230.20 to her; that as a part of the same transaction, plaintiff executed and delivered to the bank for the purpose of guaranteeing the loan, the LOAN GUARANTY AGREEMENT, a copy of which was attached to plaintiff's petition. It further alleged a loan of $15,000 to Kendall on October 14, 1966, and that the proceeds were deposited in his TV and Appliance account; that on said date, Mrs. Walton drew a check for $138.45 on the TV and Appliance account, payable to GECC, and that on October 17, 1966, she drew a second check on said account in favor of GECC for $14,119.64, which was honored in due course by the bank.

The bank further alleged that on September 14, 1967, Dreiling wrote Mrs. Walton, advising he was concerned about Kendall's loans and thought she should know about the matter as she was guaranteeing them. It further alleged the plaintiff replied to Dreiling's letter, and on October 31, 1967, Dreiling, as president of the bank, made written demand upon Kendall for payment of his entire indebtedness to the bank within ten days, such indebtedness being in the sum of $25,390, plus interest, and evidenced by two promissory notes; that payment was not made by Kendall as demanded, and Dreiling, as president of the bank, wrote plaintiff on November 20, 1967, enclosing a copy of the demand letter addressed to Kendall, and demanded that plaintiff, as guarantor of his indebtedness, make full payment of the loans; that plaintiff did not make payment, but instead, commenced this action. The prayer was that plaintiff take nothing, and that the bank have judgment against plaintiff on her guarantee in the sum of $25,390, plus interest and costs.

Mrs. Walton timely replied to the bank's cross petition, specifically incorporating all the allegations and statements in her petition setting forth the reasons she contended the guaranty agreement relied upon by the bank was null and void, and she further alleged the purported agreement was "otherwise invalid."

The record indicates a pretrial conference was held, but no pretrial order, if one was made, is specifically set forth. However,

reference is made to "Preliminary Proceedings" which appears to be a summary of a pretrial order. The summary indicates the Piqua State Bank's action against Robert E. Kendall, doing business as Kendall TV and Appliance, to recover on his indebtedness to the bank, should be presented concurrently with the instant case, and that his liability to the bank should first be determined. The bank admitted that without further explanation, Mrs. Walton would be entitled to judgment. The summary stated it was determined the bank had the burden of going forward with the evidence.

The summary further indicates that Mrs. Walton presented her motion for summary judgment; contending the bank relied upon the written guarantee which was not completely in writing and was null and void, being in violation of the statute of frauds for the reasons alleged; that parol evidence was not admissible to supply, explain, supplement or alter the incomplete writing, and that the bank wrongfully refused to surrender the $15,000 she had on deposit. The court ruled it would take the issue under advisement, and treat it as an issue of law in the case.

The issues were tried by the district court.

The bank established Kendall's indebtedness upon the two promissory notes which were executed after a financial statement and a security agreement upon his inventory were obtained from him. The first note was in the amount of $15,000, dated September 12, 1967, and due October 12, 1967, bearing interest at 7 percent per annum; the second note was in the amount of $10,390, dated September 12, 1967, and due October 12, 1967, bearing interest at 8 percent per annum. Both notes were signed by Kendall and were the last of his series of notes dating back to October, 1966, the preceding notes having been paid by renewals.

The trial then proceeded to the dispute between the bank and Mrs. Walton. Both parties offered evidence. Dreiling's testimony with respect to the loan guaranty agreement was admitted over plaintiff's objection that it was an attempt to supply, explain, supplement or alter the incomplete writing, and was in violation of the parol evidence rule.

Following the trial, the district court found that the loan made to Kendall on October 14, 1966, and represented by the $15,000 note signed only by Kendall, was made in consideration of a "direct primary contractual agreement" entered into between the bank and Mrs. Walton from which transaction she received substantial benefit

and therefore the agreement was not within the statute of frauds, citing *Mastic Tile Div., Ruberoid Co. v. Moore Associates,* 191 Kan. 266, 380 P. 2d 376. It further found that the deposit of $15,000 in the savings account was a "pledge" with sufficient delivery of possession and control by the bank to meet the requirements of a pledge of security, since the deposit could not be withdrawn without the consent of the bank upon presentation of a passbook. It further found that aside from a "primary original contract" with Mrs. Walton, the $15,000 note transaction was removed from the statute of frauds by performance of the bank in consideration of the pledge of security by Mrs. Walton's deposit of $15,000. It further found that the written LOAN GUARANTY AGREEMENT signed by Mrs. Walton was void, since it did not meet the requirements of the statute of frauds and was unenforceable, except with respect to that portion of the loan which was intended to pay the note of $5,000 held by the Fourth National Bank of Wichita on which Mrs. Walton was Kendall's guarantor, and to that extent, the loan was to the benefit of Mrs. Walton and not within the statute of frauds. The court concluded the bank was entitled to retain the $15,000 on deposit in the savings account, and rendered judgment against Mrs. Walton for $20,000, plus interest.

We first turn to the court's finding that the purported Loan Guaranty Agreement signed by Mrs. Walton does not meet the requirements of the statute of frauds. The holding of the district court in this respect was eminently correct. To be sufficient as a note or memorandum under the statute of frauds, a writing must be complete in itself, leaving nothing to rest in parol. The entire agreement must be explained in writing. The contract cannot rest partly in writing and partly in parol. In *Clark v. Larkin,* 172 Kan. 284, 239 P. 2d 970, it was held:

"A Memorandum, in order to be enforceable under the statute of frauds, may be any document or writing, formal or informal, signed by the party to be charged or by his lawfully authorized agent, which states with reasonable certainty (*a*) each party to the contract either by his own name, or by such a description as will serve to identify him, or by the name or description of his agent, (*b*) the land or other subject matter to which the contract relates, and (*c*) the terms and conditions of all the promises constituting the contract and by whom and to whom the promises are made." (Syl. ¶ 2.)

In *Wing v. Mollett,* 115 Kan. 116, 222 Pac. 88, this court quoted with approval from 27 C. J. 267, 268:

" 'To be sufficient as a note or memorandum under the statute of frauds, a writing must be complete in itself, leaving nothing to rest in parol. The entire agreement must be expressed in the writing. The contract cannot rest partly in writing and partly in parol. The general rule that a contract which is not entirely in writing is to be treated as a parol or verbal contract is applicable in determining whether the contract is within the inhibition of the statute of frauds. The memorandum must contain all the essential elements or material parts of the contract.' " (p. 118.)

See, also, *Reid v. Kenworthy*, 25 Kan. * 701, and *Cassity v. Cassity*, 147 Kan. 411, 416, 417, 76 P. 2d 862.

The document signed by Mrs. Walton is attached to the opinion as Appendix A. As will be noted, it does not name or otherwise identify the other party to the contract, or state whose debt was guaranteed, or the amount of the debt guaranteed, or in any way make reference to the principal obligation, or the terms or conditions of repayment, or the consideration, or the date of the contract.

A guarantor, like a surety, is a favorite of the law, and without further discussion of the point, we hold the loan guaranty agreement signed by Mrs. Walton lacked the essentials of a note or memorandum under the statute of frauds and was void and unenforceable.

Mrs. Walton contends there was no competent evidence to sustain the district court's finding she entered into a direct primary contractual agreement with the bank, and that she was not personally liable on the loan made to Kendall for $15,000 on October 14, 1966.

In September, 1966, Kendall sought a loan of $25,000 from the bank, where he had previous dealings. He did not have sufficient security, and the loan was refused. He owed GECC approximately $15,000, and sought the loan because it was demanding he make his account current. Because he had not done so, it had a truck at his store and was threatening to repossess his inventory. Mrs. Walton prevented GECC from picking up the inventory by assuring it she would see the obligation was taken care of.

On Friday, October 14, 1966, Kendall and Mrs. Walton met with Mr. Dreiling, in the bank, at approximately 4:30 p. m. The evidence was clear that at the meeting, Dreiling agreed with Mrs. Walton the bank would make loans to Kendall up to $25,000 if she would guarantee the loans and deposit $15,000 in a savings account to secure her obligation. To make certain Kendall had a line of credit established, and after being told by Dreiling it was not necessary for her to sign the $15,000 promissory note if she signed

the loan guaranty agreement, Mrs. Walton signed the incompleted agreement which was kept by the bank, and she deposited a check for $25,230.20 in a savings account. The bank issued her a cashier's check for $5,230.20 which she took with her. Mrs. Walton was issued a passbook for the savings account which she still has in her possession, and the bank paid her interest on the account. Later, and with the consent of the bank, Mrs. Walton withdrew $5,000 from the savings account for a purpose hereafter noted.

A loan of $15,000 was made to Kendall that day and he alone signed the promissory note, which was due in six months. The proceeds of the loan were deposited in Kendall's TV and Appliance checking account. The note was subsequently renewed without Mrs. Walton's knowledge or consent. It was Mrs. Walton's understanding that as a result of her guaranteeing the $15,000 loan, the bank would make additional loans of $10,000 to her brother, which were to be secured by the inventory of his store. She was not informed as to the amount of the loans; only that the bank's limit was $25,500.

Prior to October 14, 1966, Mrs. Walton had cosigned Kendall's $6,000 promissory note to the bank and she signed a signature card for his TV and Appliance account at that time. She later gave her brother a check to pay the note in full. Mrs. Walton wrote no checks on that account other than the two checks hereafter noted.

As indicated, Mrs. Walton had guaranteed Kendall's indebtedness to GECC, and on October 17, 1966, she wrote two checks on the TV and Appliance account in favor of GECC in the approximate amount of $15,000 in payment of Kendall's indebtedness to that company. As a result, she was relieved of her secondary obligation to GECC as Kendall's guarantor.

On October 14, 1966, Kendall owed other creditors besides the $15,000 to GECC and his unsecured promissory note to the bank in the amount of $3,779.96, but he did not know how much. It was agreed he would return to the bank on Monday, October 17, 1966, when he ascertained the amount. He returned to the bank on Monday and was loaned $8,000 for which he signed a promissory note, and subsequently the bank loaned him an additional $2,000 for which he also signed a promissory note. The proceeds of both loans were placed in his TV and Appliance checking account and part of the proceeds was used to pay his unsecured note to the bank. Those two notes were later consolidated into the $10,000

note sued on, which was renewed and extended many times without notification, consent or ratification by Mrs. Walton. She tried to talk to Dreiling about those transactions several times, but he acted as if they were none of her business, and did not want to talk to her.

From the foregoing it will be observed that as a result of the oral agreement between the bank and Mrs. Walton on October 14, 1966, she became guarantor of Kendall's indebtedness to the bank. This is evidenced not only by their oral agreement, but by Dreiling's statement that it was not necessary for her to sign the promissory note if she signed the guaranty agreement; by Dreiling's letter to Kendall demanding he pay his indebtedness in full, and, later, by his letter to Mrs. Walton making demand upon her for payment in full of Kendall's indebtedness as his guarantor. The fact that one who has made a loan of funds does not assert a claim against a third person until he has failed to receive payment from the person who was principally obligated, indicates that the third person was not looked to primarily for payment and that whatever promise he made for payment is within the statute of frauds as a collateral obligation. (49 Am. Jur., Statute of Frauds, § 91, p. 449.) Moreover, the bank's cross petition alleged that the $15,000 loan to Kendall would be made if Mrs. Walton *guaranteed* it and deposited $15,000 in a savings account. When the words of the oral agreement can have only one meaning, there exists no grounds upon which reasonable minds might differ and the question becomes one of law for determination by the court.

A guaranty is a collateral undertaking by one person to answer for the payment of a debt or the performance of some contract or duty in case of default of another person who is liable for such payment or performance in the first instance. (38 C. J. S., Guaranty, § 1, p. 1129.) In *Bomud Co. v. Yockey Oil Co.*, 180 Kan. 109, 299 P. 2d 72, 58 A. L. R. 2d 1265, it was said:

". . . A guaranty is a contract between two or more persons, founded upon a consideration, by which one person promises to answer to another for the debt, default or miscarriage of a third person, and, in a legal sense, has relation to some other contract or obligation with reference *to which it is a collateral undertaking*. *Sewing Machine Co. v. Gibbons*, 4 Kan. App. 237, 45 P. 946; 38 CJS, Guaranty, § 2; 24 Am. Jur., Guaranty, p. 873, § 2. The contract of a guarantor is his own separate contract. It is in the nature of a warranty by him that the thing guaranteed to be done by the principal shall be done, and is not an engagement jointly with the principal to do the thing. *A guarantor, not being a joint contractor with the principal, is not*

bound like a surety to do what the principal has contracted to do, but answers only for the consequence of the default of the principal. The original contract of his principal is not his contract. Sewing Machine Co. v. Gibbons, supra . . ." (l. c. 114, 115.) (Emphasis supplied.)

In *Hoag v. Boyle*, 125 Kan. 436, 440, 265 Pac. 61, the terms original and collateral promise are distinguished, and it is said that where the direct and leading object of the promise is to become the guarantor of another's debt, the agreement is collateral, and, where made before or after, or at the same time with the promise of the principal, is not valid, unless manifested by evidence in writing.

As indicated, and as a result of the meeting of October 14, 1966, Dreiling looked to Mrs. Walton to guarantee payment of the loan of $15,000 to Kendall. An oral promise to guarantee payment of another's debt has but one definite and fixed legal meaning, and is therefore not susceptible to any construction other than that of clearly manifesting the promisor's intention to answer for the debt or default of another. In this case, the intention of the parties was clear. Their agreement can be interpreted as having but one meaning, that is, Mrs. Walton stood in relationship to the bank as guarantor of Kendall's indebtedness, and other evidence showing the surrounding circumstances and situation of the parties under which the promise was made, is not required to ascertain their intention.

The bank argues Mrs. Walton entered into the guaranty agreement merely to benefit herself, and the oral contract is sufficient. It cites and relies upon *Higgin Mfg. Co. v. Bankers Mortgage Co.*, 128 Kan. 267, 277 Pac. 44; *Mastic Tile Div., Ruberoid Co. v. Moore Associates*, supra, and *Calahan v. Ward*, 45 Kan. 545, 26 Pac. 53. The cases are not in point. In the first place, they did not involve a guaranty. In the second place, they are clearly distinguishable.

In *Higgin*, supra, the plaintiff sold weather stripping equipment and installed it in a hotel and apartment building which was at that time in possession of the mortgage company as a mortgagee in possession. Following the work, the mortgage company wrote the plaintiff to the effect the statment for the weather stripping on the hotel would be paid "by us who hold the mortgage on this property," and that "as soon as this statement is OK'd by Mr. Pearcy and he states that strips are on and the work is satisfactory to him, we are ready to pay your statement." Clearly, the promise was an "original promise" in writing.

A reading of the *Mastic Tile* case, supra, discloses it has no application to the facts involved in the instant case. There, the defendant, Moore Associates, agreed in writing to make all checks payable jointly to Mastic Tile and to Custom Floor, and it was said that the written promise to the plaintiff was sufficient to take the case out of the statute of frauds. Likewise, in the *Calahan* case, supra, Mounts purchased groceries and the question presented was whether Ward made an original contract to pay for them. This court reversed, directing that the question whether the goods were sold to Mounts on his own credit, or on the credit of Ward, be submitted to the jury.

Circumstances can hardly be conceived which would induce a person to promise to answer for the debt or default of another which did not at the same time benefit the promisor, but the same benefit could equally have been the inducement for a collateral promise. The agreement between the bank and Mrs. Walton, having been one of guaranty only, the nature and effect of such agreement is not altered because Mrs. Walton received a benefit by being relieved of her secondary obligation to GECC as guarantor. The majority rule is that even if the guarantor-promisor receives some benefit from his promise, that fact alone is not enough to take the promise outside the statute of frauds. The same contention advanced here was made in *Brown & Root, Inc. v. Gifford-Hill & Company*, 319 F. 2d 65. The court rejected the argument, and said:

"The agreement of Brown & Root having been one of guaranty only, the nature and effect of such agreement is not altered because Brown & Root was interested in the resumption of the deliveries of gravel.

"If the statute of fraud[s] is held to apply only where a promisor guarantees the debt of another in a transaction in which the promisor is completely uninterested, the statute is effectively destroyed. Completely uninterested persons do not guarantee the debts of others." (p. 69.)

See, also, 49 Am. Jur., Statute of Frauds, §§ 74, 75, pp. 426-430, and 37 C. J. S., Frauds, Statute of, § 21, p. 531.

In *Citizens State Bank v. Schulte*, 123 Kan. 119, 254 Pac. 381, it was said:

". . . The existence of a consideration does not render the statute of frauds inoperative. A consideration is necessary to the enforceability of a contract whether oral or in writing, and its existence does not dispense with the need of written evidence to support a promise to pay the debt of another. *The fact that the defendant was to derive some personal benefit from the deal would not of itself take his promise out of the operation of the statute of frauds.* . . ." (l. c. 121.) (Emphasis supplied.)

It is the duty of one who contends an oral promise is outside the statute to show or establish facts taking the promise out of the statute. We are of the opinion the bank failed to sustain that burden. The record establishes that Mrs. Walton was guarantor of her brother's debt to the bank and there is nothing to support the district court's finding her promise was a "direct primary contractual agreement" entered into between her and the bank. Under the facts and circumstances, Mrs. Walton's promise is within the statute of frauds and is unenforceable.

We turn to the legal question presented by the district court's finding the deposit of $15,000 in the savings account was a pledge with sufficient delivery of possession and control by the bank to meet the requirements of a pledge of security as the deposit could not be withdrawn without consent of the bank upon presentation of a passbook.

No finding was made as to what underlying obligation the savings account was pledged to secure; Kendall's debt, or Mrs. Walton's guaranty. Be that as it may, we note Mrs. Walton made no written assignment or transfer of the savings account to the bank, nor did she deliver the passbook to it, so as to make the account available as a pledge of collateral security to the extent of the debt secured.

The appellant contends that K. S. A. 84-9-104 (k) specifically exempts any deposit, savings account, passbook, or like account maintained with a bank from provisions of the Uniform Commercial Code relating to secured transactions, and that if she made a pledge of the savings account, its validity is to be determined by the rules of the common law. We agree. K. S. A. 84-9-104 reads in part:

"This article does not apply . . .
"(k) to a transfer in whole or in part of any of the following: . . . any deposit, savings, passbook or like account maintained with a bank, savings and loan association, credit union or like organization."

The section was designed to exclude certain security transactions from Article 9 of the Uniform Commercial Code. Paragraph 7 of the official U. C. C. comment following the section states that "[r]ights under life insurance and other policies, and deposit accounts, are often put up as collateral. Such transactions are quite special, do not fit easily under a general commercial statute and are adequately covered by existing law." Further, that "[p]aragraphs (g) and (k) make appropriate exclusions." (9 Vernon's Kansas

Statutes Annotated, Uniform Commercial Code, Howe and Navin, § 84-9-104, p. 189.)

Hence, no provisions of the Uniform Commercial Code are applicable to the question presented, and we refer to our decisions and to the Restatement of the Law, Security, as they apply the common law.

The pledge is one of the simplest of the security devices. The fundamental idea of the pledge is possession by the pledgee. If the creditor's security interest depends upon possession obtained and held primarily for security, he has a pledge. No filing is required by the pledgee to perfect a security interest where he has possession of the collateral.

Restatement of the Law, Security, § 1, p. 5, defines a pledge as follows:

"A pledge is a security interest in a chattel or *in an intangible represented by an indispensable instrument,* the interest being created by a bailment for the purpose of securing the payment of a debt or the performance of some other duty." (Emphasis supplied.)

Our cases hold that a pledge of property is analogous to a chattel mortgage in that it constitutes a lien on the property pledged to secure the payment of the debt according to the contract. To constitute a valid pledge of personal property as security for a debt, it is essential that there be an actual delivery of the property by the pledgor to the pledgee and that the pledgee must thereafter hold possession of the pledge openly and adversely to the pledgor. (*Atkinson v. Bush,* 91 Kan. 860, 863, 139 Pac. 393; *State v. Hubbard,* 126 Kan. 129, 266 Pac. 939; *Columbia Casualty Co. v. Sodini,* 159 Kan. 478, 484, 156 P. 2d 524.)

The early common law recognized pledge interests only in tangible chattels. Modern law allows pledge interests also to be created in intangibles. A discussion of the subject is well stated in 53 A. L. R. 2d, Anno: Pledge by Transfer of Instrument, § 2, p. 1398, that:

"Problems involved in the free transfer of intangible property interests have been substantially solved, as to a large class of such rights, by the introduction of the concept of negotiability, by virtue of which a document representing the right is vested with many of the characteristics of an actual chattel, and it seems to be settled that such a right may be pledged by delivery of the negotiable instrument which represents it. However, there remains a large class of intangibles which may in some sense be said to be represented by a commercial document which is not, however, negotiable, and the question is frequently presented whether such a right may be pledged by delivery of the document in question. This question may be answered simply, although not

too helpfully, by saying that the courts generally recognize that if the document delivered does represent the right to the extent that it stands in the place of, or embodies, or reifies, the intangible, a pledge of the document amounts to a pledge of the right." (p. 1398.)

Incorporeal property, according to many decisions, cannot be pledged without a written transfer of the title. Debts, negotiable instruments, and other choses in action are usually pledged in this manner. In other words, an assignment is an essential part of a pledge where the thing pledged can be delivered only by assignment. In the case of a chose in action, such as a deposit in a savings account (9 C. J. S., Banks and Banking, § 997, p. 1419), the pledgee must have possession of the documentary evidence of title, with a transfer executed to him, or in blank, so as to give to him the control and power to dispose of it. *If there is no transfer attached to or accompanying the document, it is imperfect as a pledge.* (41 Am. Jur., Pledge and Collateral Security, § 15, pp. 594, 595; 72 C. J. S., Pledges, §§ 19, 20, pp. 20-24.)

Many cases recognize that incorporeal property, or any legal or equitable interest whatever in personal property, may be pledged provided it is, by actual delivery of documentary evidence of title or written transfer, placed into the hands or within the power of the pledgee so as to be made available to him for the satisfaction of the debt.

Several cases have recognized that, by delivery of a savings account passbook, the depositor may pledge his rights therein to the bank. The delivery of such a passbook as collateral security has been held to give the recipient the rights of a pledgee, vesting equitable title not only in the book, but also in the sum deposited in the bank to the extent of the debt secured. (53 A. L. R. 2d, Anno: Pledge by Transfer of Instrument, § 5, pp. 1396, 1406.)

In *M. M. Landy, Inc. v. Nicholas*, 221 F. 2d 923, 53, A. L. R. 2d 1385, it was held:

"Stock certificates, insurance policies, and savings bank books may be the subject of pledges by delivery alone." (Syl. ¶ 7.)

In *Eichler v. Hillside National Bank*, 71 N. J. Super. 110, 176 A. 2d 508, it was held:

"Savings bank books given as security may constitute a pledge." (Syl. ¶ 3.)

In *Watson v. Stockton Morris Plan Co.*, 34 Cal. App. 2d 393, 405, 93 P. 2d 855, it was said:

" 'A savings account being a chose in action may be assigned with or without a delivery of the pass book though such assignment is best evidenced by a delivery of the pass book together with a formal written assignment of the account . . .' " (p. 405.)

See, also, *Ornbaun v. First Nat. Bank,* 215 Cal. 72, 8 P. 2d 470, 81 A. L. R. 1146; *McGuire v. Murphy,* 94 N. Y. Supp. 1005, 107 App. Div. 104; *In re Smith-Flynn Commission Co.,* 292 F. 465; *Taft v. Bowker,* 132 Mass. 277; *Rix v. Dooley,* 322 Mass. 303, 77 N. E. 2d 233; *Cunningham v. Teague,* 105 Ind. App. 46, 11 N. E. 2d 525; *Underwood v. Underwood,* 43 Ga. App. 643, 159 S. E. 725, and *Wells v. Dean,* 211 La. 132, 29 So. 2d 590.

Restatement of the Law, Security, § 1, is quoted above, and refers to the pledge of an intangible represented by an "indispensable instrument." Comment ( e ) defines "indispensable instrument" as meaning the formal written evidence of an interest in intangibles so representing the intangible that the enjoyment, transfer or enforcement of the intangible depends upon the possession of the instrument. The comment states that,

". . . indispensable instruments include not only negotiable instruments such as promissory notes and bills of exchange, but also share certificates, bonds, interim certificates, *savings bank books* and insurance policies." (Emphasis supplied.)

Where a true pledge is involved, our decisions recognize that incorporeal property may be pledged, and regard the pledgee as having possession of the property right itself through assignment or delivery of the nonnegotiable instrument, thus placing in the hands of the pledgee the power to make the property available for satisfaction of the debt. In *Bank v. Bank,* 80 Kan. 205, 101 Pac. 1005, Jones on Pledges and Collateral Security (2d Ed.), § 37, is quoted as follows:

" 'A delivery of a document of title, which serves to put the pledgee in possession of the goods, is equivalent to an actual delivery of them.' " (l. c. 207.)

Generally, to the same effect are *Bailey v. Pierce,* 123 Kan. 359, 361, 255 Pac. 37; *Myers v. Isern,* 147 Kan. 182, 188, 75 P. 2d 253, and *Columbia Casualty Co. v. Sodini,* supra. In the latter case it was said it was recognized that incorporeal property, such as a certificate of corporate stock, might be pledged by written transfer of title, and that it was immaterial that the pledge was of stock of an out-of-state corporation.

As indicated, certain kinds of instruments sufficiently represent

obligations that a delivery of them pledges the obligation. We conclude that a savings account, being a chose in action, is a proper subject of a pledge, and may be placed in possession of the pledgee by delivery of the passbook, or by a written assignment of the account to the extent of the debt, and that such delivery is best evidenced by a delivery of the passbook together with a formal written assignment to the pledgee.

The record is clear the bank obtained no formal written assignment of the savings account from Mrs. Walton, nor did it request she deliver possession of the passbook to it. That being the case, we hold there was no transfer or delivery of possession of the savings account to the bank so as to constitute a valid pledge, and that what occurred was insufficient to establish a lien created by a pledge in favor of the bank. The resulting relationship between Mrs. Walton and the bank was in fact that of debtor and creditor; the amount of $15,000 deposited in the savings account represented merely an indebtedness by the bank to her as a depositor, and she was entitled to have the deposit returned to her upon demand.

As indicated, the district court found the bank was entitled to judgment against Mrs. Walton for the $5,000 she withdrew from the savings account and which she paid to the Fourth National Bank in Wichita to relieve her obligation as guarantor of Kendall's indebtedness to that bank. The finding and judgment cannot stand. In the first place, the $5,000 was Mrs. Walton's money, and in the second place, as has been determined, the bank had no lien upon it as pledgee.

What has been said disposes of this case, and requires a reversal of the judgment of the district court with directions to enter judgment in favor of the plaintiff for $15,000, plus interest.

## APPENDIX A

### Loan Guaranty Agreement

FOR VALUE RECEIVED and to enable _____ of _____, hereinafter designated as "Debtor," to obtain credit, from time to time, of _____, we hereby request said Bank to extend to said Debtor such credit as said Bank may deem proper, and we hereby jointly and severally guarantee the full and prompt payment to said Bank at maturity, and at all times thereafter, and also at the time hereinafter provided, of any and all indebtedness, liabilities and obligations of every nature and kind of said Debtor to said Bank, and every balance and part thereof, whether now owing or

due, or which may hereafter, from time to time, be owing or due, and howsoever heretofore or hereafter created or arising or evidenced, to the extent of

_____ Dollars,

and we jointly and severally also agree to pay in addition thereto, all costs, expenses and reasonable attorney's fees at any time paid or incurred in endeavoring to collect said indebtedness, liabilities and obligations, and in and about enforcing this instrument.

All diligence in collection, and all presentment for payment, demand, protest, notice of protest, and notice of nonpayment, dishonor and default, and of the acceptance of this guaranty, and of any and all extensions of credit hereunder, are hereby expressly waived.

The granting of credit from time to time by said Bank to said Debtor in excess of the amount of this guaranty and without notice to the undersigned, is hereby authorized and shall in no way affect or impair this guaranty.

Authority and consent are hereby expressly given said Bank from time to time, and without any notice to the undersigned, to give and make such extensions, renewals, indulgences, settlements and compromises as it may deem proper with respect to any of the indebtedness, liabilities and obligations covered by this guaranty, including the taking or releasing of security and surrendering of documents.

In case of the death, dissolution, liquidation, failure, insolvency or bankruptcy of said Debtor, all of said indebtedness, liabilities and obligations, to the extent of the amount of this guaranty, shall, at the option of said Bank, become immediately due from, and be forthwith paid by the undersigned to said Bank, the same as though said debts, liabilities and obligations had matured by lapse of time.

This guaranty shall be construed according to the laws of the State of _____, in which state it shall be performed by the undersigned.

This guaranty shall be binding upon the undersigned jointly and severally, and upon the heirs, legal representatives and assigns of the undersigned, and each of them, respectively and shall inure to the benefit of said Bank, its successors, legal representatives and assigns.

Signed and Sealed by the undersigned, at _____ this
_____ day of _____, 19___.

/s/   Marjorie E. Walton

(Seal)
Witnesses
/s/   Illegible

Fromme, J.: Dissenting in part. The judgment appealed by Marjorie Walton was for $20,000. The amount which she placed in the possession of the Piqua State Bank was $15,000. I would

affirm the district court's judgment to the extent of the $15,000 pledge and reverse the judgment as to the $5,000 portion which must rely upon the guaranty agreement for efficacy. I respectfully dissent from paragraphs 10, 11 and 12 of the syllabus which in effect hold the transfer of $15,000 to the Piqua State Bank was not a sufficient delivery of possession and control of the monies to effectuate the pledge without delivery or assignment of the savings account pass book.

The savings account pass book is only evidence of the money itself. The $15,000 was in possession of the Piqua State Bank. The court's opinion completely overlooks the fact that this was not a pledge of a savings account located in some other bank. The authorities relied on and cited by the majority do not apply to a pledge of money actually transferred to and held by the creditor bank to whom the pledge was made.

The provisions of K. S. A. 9-1206 read:

"Any bank shall have the right to set off any obligation or claim which it has, when the same is matured against any depositor."

Marjorie Walton does not deny that this $15,000 was transferred to the Piqua State Bank and placed in possession and under control of the bank in order to furnish security necessary for her brother to obtain additional financing. She does not deny that the loans secured thereby were unpaid and due the bank. No third persons were involved. Under the circumstances no savings account book or written assignment was necessary to constitute a valid pledge of the $15,000. The money may have been stacked in the bank's vault. The issuance of the pass book did not change the rights of the parties. It merely evidenced and identified the source of monies held by the bank as a pledge. The pledge should be honored.

PRICE, C. J., and FONTRON, J., join in the foregoing dissent.