1300

Betty TROTTER, Appellant v. FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION, Respondent. Betty TROTTER, Appellant v. The CITIZENS AND SOUTHERN NATIONAL BANK OF SOUTH CAROLINA and Terry Long, Respondents.

(378 S. E. (2d) 267)

Court of Appeals

*A. Camden Lewis* and *Mary G. Lewis* of *Lewis, Babcock, Pleicones & Hawkins,* Columbia, *for appellant.*

*William W. Kehl* of *Wyche, Burgess, Freeman & Parham,* and *Frank H. Gibbes, III* of *Rainey, Britton, Gibbes & Clarkson,* Greenville, *for respondents.*

Heard Jan. 17, 1989.

Decided March 6, 1989.

CURETON, Judge:

This case involves the authority of Respondent—Citizens & Southern National Bank to obtain funds from an account established by Betty Trotter and assigned to the bank by Mrs. Trotter's son. The trial court granted summary judgment to First Federal Savings and Loan Association, Cit-

izens and Southern National Bank of South Carolina, and Terry Long. We affirm.

On a motion for summary judgment the trial court and this court must construe all ambiguities, conclusions, and inferences arising in and from the evidence in the light most favorable to the non-moving party. Summary judgment is appropriate only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Butts v. AVX Corp.*, 292 S. C. 256, 355 S. E. (2d) 876 (Ct. App. 1987). It is not sufficient to rebut a motion for summary judgment that a party create an issue of fact that is not genuine or an inference which is not reasonable. *Main v. Corley*, 281 S. C. 525, 316 S. E. (2d) 406 (1984).

On May 15, 1981, Mrs. Trotter purchased a six month money market certificate[1] from First Federal. The opening balance was $80,000 and the account holders were designated as "Mrs. Betty Trotter or Howard Preston Trotter or Willis P. Trotter Jr." The funds were furnished by Mrs. Trotter. Howard and Willis are her sons. Mrs. Trotter stated she opened the account this way because her husband had his accounts in this form prior to his death and she wanted her sons to have the money if anything happened to her.

In 1982, Willis wanted to build a house. He approached Terry Long, an employee of C & S, about obtaining funds for construction. The record reflects Willis and Long knew each other from the community but were not close friends. Mrs. Trotter agreed to help Willis secure the construction financing and to place the First Federal savings passbook with C & S as collateral. She testified the passbook was to be used as collateral until her son could secure a mortgage on the house because interest rates were fluctuating. On March 20, 1983, the mortgage loan on the house was closed. By that time Willis had received approximately $63,000 which was secured by the money market certificate. The mortgage loans proceeds of $58,000 were applied to the loan leaving a balance due to C & S of $8968.69. Mrs. Trotter testified she was aware of the balance and, as she understood it, the

---

[1] While the parties make much of the designation "money market certificate" the instrument itself certifies that "the account holder holds a savings account" with First Federal.

certificate remained in the possession of C & S as collateral for that amount only.

After March of 1983, Willis secured more money from C & S through Terry Long. On July 19, 1984, Willis executed an installment loan agreement with C & S in the amount of $25,745.74. He also executed an assignment in that amount with respect to the First Federal account. This assignment was recorded on August 16, 1984, at First Federal. On September 4, 1984, Willis executed a $3000 bank note to C & S and also executed another assignment for that amount of the First Federal account. The second assignment was recorded at First Federal on September 13, 1984. During this time the First Federal certificate remained in the possession of C & S. Mrs. Trotter did obtain it on occasion for the purpose of renewing the money market certificate, but each time she signed a trust receipt for it and always returned the certificate to C & S.

On November 13, 1984, Mrs. Trotter obtained the certificate from C & S and took it to First Federal. She had decided to transfer the funds into a savings account in her name alone as suggested by the attorney who drafted a will for her. Testimony indicates Mrs. Trotter was advised at the time of the transfer of the funds by First Federal that its records indicated an assignment of the certificate. Mrs. Trotter testified she thought this assignment referred to the $8968.69 balance from the loan closing in 1983. A lock-out was placed on First Federal's computer indicating the new savings account was laden with the assignment. She returned the new passbook to C & S.[2]

Suffice it to say Willis did not repay the loans to C & S and the bank sought payment from First Federal pursuant to the assignments executed by Willis. First Federal debited the new account of Mrs. Trotter. Shortly thereafter Mrs. Trotter testified she inquired at C & S about her passbook. At this time she found out about the withdrawals from her new account. Willis had not told her about the loans.

Mrs. Trotter sued the banks on various theories including

---

[2] It seems clear Mrs. Trotter intended the assignment to attach to the new account, but she claims the new account was burdened only to the extent of the $8,968 balance owing in 1983.

conversion, breach of duty, breach of contract, and conspiracy. In this appeal she claims the trial court erred in granting summary judgment because there are genuine issues of material fact concerning the contractual right of Willis to assign the First Federal certificate and the right of C & S to loan Willis money using the certificate as collateral given the alleged knowledge of Terry Long that the sole purpose of the assignment of the passbook was to secure the $8000 loan balance. She also raises the issue of the validity of the notice of the assignments to First Federal.

Mrs. Trotter claims there is a genuine issue of fact concerning the contractual right of Willis to assign the 1981 First Federal account to C & S. The relationship between a general depositor and a bank is generally that of a creditor and a debtor. *Owens v. Andrews Bank & Trust Co.*, 265 S. C. 490, 220 S. E. (2d) 116, (1975); *Burwell v. South Carolina National Bank*, 288 S. C. 34, 340 S. E. (2d) 786 (1986). The relationship is usually defined by the contractual agreement between the depositor and the bank. *See Johnson v. National Bank of South Carolina of Sumter*, 213 S. C. 458, 50 S. E. (2d) 177 (1948). Mrs. Trotter submitted an affidavit which stated she had several certificate of deposit accounts with First Federal. She states in her affidavit that "as per my agreement with First Federal Savings and Loan for all my certificates of deposit accounts, I was the only person authorized to make withdrawals from the accounts and the only person authorized to control such account uses." First Federal submitted an affidavit of one of its employees which stated the money market certificate was issued to the three persons whose names appeared on the copy of the account signature card attached to the affidavit. This signature card contains the three signatures of Mrs. Trotter and her two sons including Willis Trotter. The signature card reads, in part, as follows:

> As joint tenants with right of survivorship and not as tenants in common, and not as tenants by the entirety, the undersigned hereby apply for a savings account in First Federal Savings & Loan Association of Greenville and for the issuance of evidence thereof in their joint names described as aforesaid. *You are directed to act pursuant to any one or more of the joint tenant's sig-*

*natures, shown below, in any manner in connection with this account.* (emphasis ours).

The evidence establishes as a matter of law the First Federal certificate was contractually subject to control by Willis as well as Mrs. Trotter.[3] His name was on the account and the contractual agreement directed First Federal to act pursuant to any one or more of the signatures. For example, if Willis had taken the passbook to First Federal he would have been permitted to withdraw the funds from the account on his signature alone. This is not to say his mother may not have proceeded against him for recovery of all or part of the funds. However, this right between the two of them does not control the relationship with First Federal. Otherwise, every bank would be required to inquire at its peril into the right of a party to an "or" account to withdraw money from the account.

South Carolina statutes and case law recognize these principles. At the time of these events Section 34-11-10(b), Code of Laws of South Carolina, 1976, was in effect. That section permitted the pledge of a deposit account in the name of two or more persons by any depositor

---

[3] Mrs. Trotter relies on a statement in her affidavit to the effect she was the only person authorized to make withdrawals and control the account to create a question of fact. The statement in her affidavit is not a statement of fact but is a statement of her position or argument in this dispute. She admitted in her deposition the First Federal money market certificate was issued in the names of "Mrs. Betty Trotter or Howard Preston Trotter or Willis P. Trotter, Jr." The record contains no evidence by affidavit or deposition testimony that the signature card produced by First Federal was not the card she signed for the account. The statement in her affidavit concerning "the C.D. account from which C & S took my money" obviously refers to the second account she opened in November 1984. The account card produced by First Federal constitutes a contractual agreement. When a summary judgment motion presents a question as to the construction of a written agreement that can be determined by the unambiguous language of the contract, the issue is one of law for the court. *Lyles v. BMI, Inc.*, 292 S. C. 153, 355 S. E. (2d) 282 (Ct. App. 1987); *First-Citizens Bank & Trust Co. v. Conway National Bank*, 282 S. C. 303, 317 S. E. (2d) 776 (Ct. App. 1984). A conclusory statement on the issue in dispute does not create a question of fact precluding summary judgment. Mrs. Trotter's statement in her affidavit is also inconsistent with the document it refers to and therefore lacks probative value. *See Lail v. South Carolina State Highway Dept.*, 244 S. C. 237, 136 S. E. (2d) 306 (1964) (failure to offer evidence of probative value to refute engineering facts). Her affidavit therefore creates no question of fact so as to preclude summary judgment.

whose name is on the account and by whose signature funds may be withdrawn. This statute was repealed effective July 1, 1987. Act No. 539, 1986 *S. C. Acts* 3446. However, the substance of the statute is retained in Article Six of the South Carolina Probate Code. Mrs. Trotter argues Section 62-6-103(a) governs her rights. That section provides that a joint account belongs, during the lifetime of all parties, to the parties in proportion to their net contributions to the account. In essence, she says that because she put all the money in the First Federal account Willis has no right to it. This argument may be valid in a contest between Mrs. Trotter and Willis to determine ownership of the funds but Section 62-6-102 states that Section 62-6-103 has no bearing on the power of withdrawal of the parties to the account as determined by the terms of the account contract. The Reporter's Comments state Sections 62-6-108 through 62-6-113 apply to financial institutions which make payment of funds in accordance with the terms of the account contract. Under Section 62-6-108 a financial institution may enter into a multi-party account and any multi-party account may be paid on request to any one or more of the parties. A financial institution is not required to inquire as to the source of funds received for deposit or to inquire as to the proposed application of any sum withdrawn from the account.

The distinction between the relationship of the parties to an account *inter se* and to the bank is recognized in the case law. An account card was discussed in *Austin v. Summers*, 237 S. C. 613, 118 S. E. (2d) 684 (1961). The case states the contract of deposit permitted one party to an account to withdraw the money without liability by the bank to the other party. *Id.* at 623, 118 S. E. (2d) at 688. Other cases also demonstrate the distinction between the rights between the parties and the contractual agreement with the bank. *See Hawkins v. Thackston*, 224 S. C. 445, 79 S. E. (2d) 714 (1954); *Johnson v. Herrin*, 272 S. C. 224, 250 S. E. (2d) 334 (1978); *Clinkscales v. Clinkscales*, 275 S. C. 308, 270 S. E. (2d) 715 (1980). Since Willis Trotter had contractual authority over the First Federal account he had authority to pledge it to C & S.

Mrs. Trotter next argues the savings account opened in November 1984 was never validly assigned to C & S and thus C & S never had any interest in the new

account. The trial judge concluded the relationship between Mrs. Trotter and the banks was governed by Chapter Nine of the Uniform Commercial Code. He interpreted Section 36-9-306 to define "Proceeds" as including the funds in the new savings account which C & S could trace from the old Certificate. He therefore concluded C & S's security interest in the savings account authorized it to collect against the account pursuant to Section 36-9-502. Mrs. Trotter argues that pursuant to Section 36-9-104(k), Chapter Nine does not apply to the savings account.[4] We agree. The exclusion of the savings account from the operation of Chapter Nine is clear and unambiguous.

Notwithstanding the exclusion of this transaction from the tracing provisions of Chapter Nine, we hold as a matter of precode common law, Mrs. Trotter did not destroy C & S's claim to the funds by transferring the funds to another account. The record shows she signed a trust receipt for the Money Market Certificate and converted the funds to a savings account in her name. She then returned the passbook representing the funds to C & S. Under these circumstances C & S's security interest persisted in the new savings account. *Walton v. Piqua State Bank*, 204 Kan. 741, 466 P.(2d) 316 (1970); *see also Wightman v. American National Bank of Riverton*, 610 P.(2d) 1001 (Wyo. 1980). Moreover, the trial judge held that even without the assistance of Chapter Nine, C & S's security interest continued into the new account on the common law theory the certificate was pledged and delivery of the passbook which represented the pledged funds served to repledge the account. No exception was taken to this alternative ruling and thus it becomes the law of the case.

Mrs. Trotter argues the assignments were not forwarded to First Federal until after she closed the money market account in November 1984 and opened the new savings ac-

---

[4] Section 36-9-104(k), Code of Laws of South Carolina, 1976, provides the Chapter does not apply:

(k) to a transfer in whole or in part of any of the following: any claim arising out of tort; any *deposit, savings, passbook* or *like account maintained with a bank, savings and loan association, credit union or like organization.* (emphasis added).

count in her name. This assertion is contrary to the evidence in the record. The assignments show the dates they were recorded by First Federal. The testimony of the bank employee who dealt with Mrs. Trotter establishes she noted the presence of the assignments on the First Federal computer at the time the account was changed by Mrs. Trotter. The evidence does not give rise to a reasonable inference the assignments were not received until 1985.

Mrs. Trotter also claims Terry Long, the C & S employee who made the loans to Willis, knew the savings passbook was intended by Mrs. Trotter to secure only the shortfall of $8000 after application of the construction mortgage proceeds and that he deliberately loaned more money to Willis contrary to her express prohibition. The only reasonable inference to be drawn from Mrs. Trotter's testimony is she complained to Terry Long about the pledge of the account in 1985 after she discovered her account had been charged with the loan balance. There is no evidence creating a genuine issue of fact that Mrs. Trotter instructed Terry Long not to loan Willis more money after the 1983 loan closing.

The record supports the decision of the trial court. The circumstances are unfortunate for Mrs. Trotter who perhaps trusted her son too much; however, the banks acted within the law.

All other contentions argued by Mrs. Trotter are without merit and we dispose of them under provisions of Section 14-8-250, Code of Laws of South Carolina, 1976.

Affirmed.

SANDERS, C. J., and GARDNER, J., concur.

